## Heidtman Estate.

Argued April 26, 1973.   Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Peirce A. Hammond, Jr.,* with him *Harris, Hammond and Harris,* for appellants.

*George R. Eves,* for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, July 2, 1973:

This appeal raises two issues: (1) does a husband, by virtue of the marital relation to his incompetent spouse, possess such an adverse interest in her property that he must be precluded from appointment as guardian of her estate? (2) if, as a matter of law, there is no adverse interest by reason of the husband-wife relation

alone, did the evidence presented in the court below justify a finding of adverse interest in fact?

The question of the necessity of a guardian for Laura H. Heidtman's estate is not in issue: her incompetence was conclusively established by medical testimony in the proceedings below and is not disputed by the appellants. The only question before us is whether the lower court properly appointed the incompetent's husband to serve as guardian.[1]

Laura Heidtman was admitted to the Reading Hospital on March 30, 1972. She was examined there by Dr. Elmer Horst, who found her "acutely disturbed and very paranoid." Laura Heidtman's husband, Walter Heidtman, petitioned the court for an adjudication of incompetence. He also requested that he be appointed as guardian of Laura Heidtman's estate. After a hearing on May 5, 1972, the court issued its June 7, 1972, decree of incompetence and appointed Walter Heidtman as guardian of the estate.

On June 22, 1972, Estelle Gray, Florence Hirst and George Harnly, siblings of the incompetent, filed exceptions to the lower court's exclusion of offered evidence, its appointment of Walter Heidtman as guardian and the failure to appoint a "disinterested" guardian. On October 16, 1972, the court issued a decree sustaining these exceptions for the limited purpose of determining the admissibility of the excluded evidence and to judge whether such evidence, if admitted, could establish circumstances which would warrant a denial of the appointment of the incompetent's husband as guardian.

A second hearing was held on November 10, 1972. On December 4, 1972, the court issued a final decree in

---

[1] We acquired jurisdiction pursuant to Section 202(3) of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P. L. 673, §202, 17 P.S. §211.202(3).

which it dismissed the exceptions and "confirmed absolutely" the appointment of Walter Heidtman as guardian. Estelle Gray and Florence Hirst have taken this appeal from the court's decree.[2]

The Rules of the Orphans' Court, Section 14, Rule 142(a)(8), provide that "[a] petition to adjudicate a person incompetent and to appoint a guardian of his estate shall set forth . . . an averment that the proposed guardian has no interest adverse to the alleged incompetent."[3] From this basic rule the appellants would have us extrapolate a corollary that a husband cannot be appointed guardian of the estate of his incompetent wife. The appellants cite legislation affording married women property and contractual rights (Act of July 15, 1957, P. L. 969, §1, 48 P.S. §32.1), the right to control separate earnings (Act of April 3, 1872, P. L. 35, §§1, 2, 48 P.S. §§34, 35), the right of a married woman to control property upon the husband's desertion (Act of May 4, 1855, P. L. 430, §§2, 4, 48 P.S. §§42, 43) and the right of a married woman to be free from liability for her husband's debts (Act of April 11, 1848, P. L. 536, §6, 48 P.S. §64). Appellants maintain that in view of legislation establishing the independence of a *competent* married woman from her husband's proprietary control it would be anomalous to permit an *incompetent* woman to be "victimized" by her husband. On the strength of this argument alone, we are urged to promulgate a rule which would raise a presumption of adverse interest in the husband seeking appointment as

---

[2] The incompetent's brother, George Harnly, though a party to proceedings below, is not an appellant here.

[3] The petition of Walter Heidtman for an adjudication of incompetence and his appointment as guardian of the estate does not include an averment of *no adverse interest*. The appellants do not challenge the sufficiency of the pleadings, however, in this appeal and the issue is not therefore before us.

guardian of his wife's estate, a presumption based solely upon his marital relation to the incompetent wife. The effect would be novel, but untenable: the husband would bear the burden of coming forward with evidence that his wish to serve as guardian of the incompetent wife's estate is uncompromised by the opportunity for personal gain. We believe that the court below has properly placed the burden of proof of adverse interest with those who have challenged the husband's petition for appointment as guardian.

Appellants argue, alternatively, that on the evidence presented the court should not have appointed the appellee as guardian of his wife's estate because adverse interest is factually indicated. When a decree of incompetence is entered the incompetent is made a ward of the court appointing the guardian, and his estate is in the custody of that court. "Necessarily, therefore, the appointment of guardians for the incompetent . . . is within the sound discretion of the court to which the application has been made; and [the appellate] court will not reverse unless there has been an abuse of discretion." *Voshake's Estate,* 125 Pa. Superior Ct. 98, 101, 189 A. 753, 755 (1937) ; *see Coulter Estate,* 406 Pa. 402, 412, 178 A. 2d 742, 747 (1962) ; *Arthur's Case,* 136 Pa. Superior Ct. 261, 264, 7 A. 2d 55, 57 (1939). A thorough examination of the record reveals no abuse of discretion by the lower court in this case.

Walter and Laura Heidtman have been married for forty-eight years. They are the owners of real estate as tenants by the entirety. Mrs. Heidtman owns separate assets in the form of stocks, bonds and other personalty. Walter Heidtman has owned and operated his own business for forty-two years. He is experienced in handling investments and securities and believes that he is capable of managing his wife's assets.

With the intent to prove Walter Heidtman's adverse interest, the appellants offered extracts of a book belonging to Laura Heidtman which contains memoranda of personal business transactions, some involving her husband.[4] These notations, in themselves, evidence neither negligence nor intentional misconduct by Walter Heidtman. Nor do Mrs. Heidtman's writings alone support a charge of overreaching by her husband in the management of their jointly held property. Upon this record, there is insufficient evidence of adverse interest to justify a finding of an abuse of discretion by the court below.

Decree affirmed. Appellants to pay costs.

_____

[4] A 1965 reference to her purchase of R. C. A. stock in 1948 contained the following: "Walter bought this for me. I paid for them. I never get Walter Heidtman to get any stock for me unless I pay cash or a check for them. I do owe Walter Heidtman I think it was $58.00 when he paid to make up another stock when I was in the hospital in Phila."

A 1964 notation, concerning a split in her Atlantic Refining Company stock, reads as follows: "in 1963 I had 36 shares then there was a split 2½ for 1—in 1963. I am sure this is not right as Walter has so much more than I have and we both bought the same amount. I payed [sic] Walter Heidtman for what he bought me Atlantic Ref. June—1963. I had 36 shares split 2½ for 1, $54.00, Walter had 75. We bought Atlantic Ref. at the same time. I have 90 shares now. I think Walter had 282½."

A later undated notation reads as follows: "Walter sold my Standard Oil of New Jersey. I don't know what he bought."

Another undated memo provides: "I should have 25 shares and 10 shares and there is no 10 or 20 shares. Walter got this all mixed up when I was in the hospital. I ask to get my stocks back. I got them, but I do not think this is right. Look this up."

A final reference to the stock in Atlantic Refining Company reads as follows: "We bought these at the same time and we had the same amount, he had over 3 hundred and I only have 90 shares now in my name. In 1954 I was getting $45.00 same as in 1961. I am sure there was a split 2½ for 1 share and I got a check for $54.00. Now I have 90 shares. I am sure this is not right."